Cynthia **ANDERSON, Sandy Bushong, Peggy Terrell, Betty Butner, Judy Stivers, Nancy Lachance,** and **Angela Flynn, individually and on behalf of a class of similarly situated persons, Plaintiffs,**

v.

**PIEDMONT AVIATION, INC., and U.S. Airways, Inc., Defendants.**

No. 1:98CV00652.

United States District Court, M.D. North Carolina.

July 16, 1999.

B. Ervin Brown, II, James Samuel Gibbs, Jr., Moore and Brown, Winston–Salem, NC, Beverly C. Moore, Jr., Moore and Brown, Washington, DC, for Cynthia Anderson, Sandy Bushong, Peggy Terrell, Betty Butner, Judy Stivers, Nancy Lachance, Angela Flynn, plaintiffs.

Penni Pearson Bradshaw, Kilpatrick Stockton, L.L.P., Winston–Salem, NC, Tom A. Jerman, O'Melveny & Myers, L.L.P., Washington, DC, for Piedmont Aviation, Inc., U.S. Airways, Inc., defendants.

## MEMORANDUM OPINION

BULLOCK, Chief Judge.

This diversity action is before the court on Defendant U.S. Airways, Inc.'s (U.S. Airways) motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1] Plaintiffs are former employees of U.S. Airways who seek to recover tort damages for injuries allegedly sustained as a result of symptoms of "sick building syndrome" that they claim U.S. Airways employees experienced while working in the U.S. Airways reservation office in Orlando, Florida. Plaintiffs' first cause of action for fraudulent concealment alleges that U.S. Airways concealed from Plaintiffs the alleged fact that the reservation center was a "sick building" and further alleges that such concealment caused Plaintiffs to contract a variety of illnesses. Plaintiffs' second cause of action for intentional infliction of emotional distress is based on these same allegations. The primary issue for the court is whether the factual allegations in Plaintiffs' amended complaint are sufficient to avoid the Florida Workers Compensation Act's exclusive remedy provision. For the following reasons, the court will grant Defendant's motion to dismiss.

## FACTS

In their amended complaint, Plaintiffs, who all worked at the U.S. Airways reservation center in Orlando, Florida, assert that the reservation center (the building) is a "sick building." (Pls.' Am. Compl. ¶ 23). Plaintiffs contend that Piedmont, which as noted above merged with U.S. Airways in 1989, constructed the building in 1986 with knowledge that it was located over or nearby a former toxic waste dump site and adjoining contaminated lake. Nevertheless, Plaintiffs allege that Piedmont held the building out as a safe place to work.

Plaintiffs allege the building's location in combination with the building's own poor ventilation system caused it to become a "sick building." Plaintiffs define a "sick building" as "one in which inadequate ventilation, chemical contamination from indoor or outdoor sources, or exposure to other biological contaminants causes a variety of serious medical conditions in its occupants." (Pls.' Br. at 5–6 (citing Am. Compl. ¶ 13)). Such medical conditions include acute discomfort, headache, eye, nose or throat irritation, dry cough, dry or itchy skin, dizziness and nausea, difficulty in concentrating, fatigue, and sensitivity to odor. Together these conditions are referred to as "sick building syndrome." (Am.Compl.¶ 13).

Plaintiffs contend that U.S. Airways was aware that the building was a sick building by 1992 at the latest. At that time the National Institute for Occupational Safety and Health (NIOSH) received a confidential request for a health hazard evaluation at the building. The 1992 NIOSH investigation reported that U.S. Airways employees had been voicing concerns to U.S. Airways for a period of at least two years. The NIOSH report further revealed that some of the reservation agents had experienced such symptoms as difficulty breathing, skin rash, fatigue, headaches, metallic taste in mouth, and mental confusion while at work. The NIOSH report indicated that 66% of the workers at the building reported experiencing one or more "sick building symptoms" in the four weeks preceding the investigation.

In addition to the circumstances described in the NIOSH report, Plaintiffs also assert that on more than one occasion since November 1992 the local fire department had been called to the building after numerous employees lost consciousness and had to be rushed to the hospital. Plaintiffs further allege that by 1994 U.S.

---

**1.** Defendant Piedmont Aviation, Inc. (Piedmont) ceased to exist in 1989 after it merged with U.S. Air, Inc. (U.S. Air). US Air changed its name to U.S. Airways, Inc., in 1997. Thus U.S. Airways is the corporate successor to Piedmont and Piedmont no longer exists as a separate entity. *See* Def.'s Mem. of Law in Supp. of Mot. to Set Aside Default.

Airways knew that the carbon monoxide levels in the building were measured at unacceptable levels, indicating a problem with the building's ventilation system.

Plaintiffs contend that U.S. Airways concealed its knowledge about the condition of the building from them. Plaintiffs allege one instance in which U.S. Airways fired a physician who recommended to one employee that she not re-enter the building because it was a "sick building." Plaintiffs allege that they have suffered numerous serious medical conditions as a result of U.S. Airways' conduct. Based on these allegations, the amended complaint asserts claims for fraudulent concealment and intentional infliction of emotional distress.

## DISCUSSION

Dismissal under Rule 12(b)(6) is improper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In considering a motion to dismiss, the court accepts as true all well-pleaded allegations and views the complaint in the light most favor to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993).

■ The court must first address whether North Carolina or Florida law applies. When sitting in diversity, this court applies the law of North Carolina, including its choice of law rules, in tort actions involving personal injury or wrongful death. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). North Carolina has long followed the *lex loci* rule, which applies the substantive law of the state in which the injury occurred. *See Boudreau v. Baughman*, 322 N.C. 331, 368 S.E.2d 849 (1988).[2] As it is undisputed that Plaintiffs' injuries occurred in Florida, the *lex loci* rule would dictate application of Florida law to this case. The parties have indicated that they perceive no actual conflict between Florida and North Carolina law because the laws of the two states are the same or would produce the same results. Thus, despite the *lex loci* rule, both sides focus their respective arguments on North Carolina law.

■ After reviewing North Carolina and Florida law, however, the court believes that it is appropriate to apply Florida law to this case. First, Florida has provided a clear definition for the "intentional tort" exception to the exclusive remedy provision of the Florida act. *See Fisher v. Shenandoah Gen. Constr. Co.*, 498 So.2d 882, 883 (Fla.1986) (defining "intentional tort" as the employer exhibiting either "a deliberate intent to injure or engag[ing] in conduct which is substantially certain to result in injury or death").

In contrast, the boundaries of North Carolina's intentional tort exception are less clear. In *Woodson v. Rowland*, 329

2. In *Braxton v. Anco Elec., Inc.*, 330 N.C. 124, 409 S.E.2d 914 (1991), the North Carolina Supreme Court held that North Carolina law controlled the issue of whether the "exclusive remedy bar" imposed by the workers compensation statute barred an employee from pursuing a tort claim where the plaintiff is a North Carolina worker covered under the North Carolina act even though the plaintiff suffered injury out of state. The court based its holding on the "mutual concessions" inherent in the workers compensation system and the importance of upholding the expectations of the plaintiff "as a beneficiary of the particular bargain which North Carolina has struck between the rights of employees as potential plaintiffs seeking to recover in tort for work-related injuries and the rights of employers and third-parties as potential tortfeasors seeking to escape liability by virtue of the blanket provision of compensation for such injuries." *Id.* at 915. Because Plaintiffs in this case are Florida workers presumably covered under Florida's workers compensation statute, the *Braxton* exception to the *lex loci* rule is not applicable here. Moreover, the rationale of *Braxton*, which indicates a preference for having the exclusive remedy question decided under the law of the state which provides the employees' workers compensation coverage, supports application of the traditional *lex loci* rule in this case because Plaintiffs are Florida workers.

N.C. 330, 407 S.E.2d 222 (1991), the North Carolina Supreme Court held that a tort claim alleging intentional conduct substantially certain to cause serious injury or death which did cause injury or death was beyond the purview of the North Carolina act because such conduct was "tantamount to an intentional tort." *Woodson,* 407 S.E.2d at 228. However, the North Carolina Supreme Court has not specifically defined what an intentional tort is in this context. In particular, the North Carolina Supreme Court has not clarified whether, in the workers compensation context, the term "intentional tort" is limited to conduct exhibiting a deliberate intent to injure such as a battery claim or extends to a fraudulent concealment claim such as the one advanced by Plaintiffs here which alleges intentional conduct in the form of alleged intentional concealment but which does not allege an intent to injure. Although it is not clear which course North Carolina would take, it is conceivable that it would choose the broader approach, in which case an actual conflict would exist between Florida and North Carolina law.

Moreover, the court has not found any reported North Carolina decision in a case involving allegations of an intentional failure to disclose a hazardous or unsafe work environment but has found Florida cases addressing this topic. *See, e.g., Lawton v. Alpine Engineered Prods., Inc.,* 498 So.2d 879 (Fla.1986) (claims, which included a claim for fraud, against an employer who ordered employee to operate dangerous machinery without warning employee of machine's known hazards did not fall within the "intentional tort" exception to workers compensation exclusivity). Thus, the court has clear guidance from Florida courts as to how the exclusivity question should be resolved under Florida law but lacks similar guidance from North Carolina courts. Accordingly, because there is no square holding in North Carolina recognizing or declining to recognize an action of the type alleged by Plaintiffs in this case, the court will assume that a conflict exists and that it is therefore necessary to apply Florida law. *See Lowe's North Wilkesboro Hardware, Inc. v. Fidelity Mut. Life Ins. Co.,* 319 F.2d 469 (4th Cir. 1963) (where there was no square holding in North Carolina as to the cause of action involved in the case, it was appropriate to assume that an actual conflict of laws existed so as to require a determination of whether to apply North Carolina or Pennsylvania law).

US Airways' principal argument is that Plaintiffs' claims are barred by the Florida Workers Compensation Act's, Florida Statute Annotated §§ 440.01 *et seq.* (the Act), exclusive remedy provision. The court agrees. The Act generally provides the exclusive remedy for employees seeking to recover for workplace injuries. In particular, the Act provides that "[t]he liability of an employer prescribed in § 440.10 shall be exclusive and in place of all other liability of such employer ... on account of such injury or death." Fla. Stat. Ann. § 440.11(1) (West 1998). Despite this broad language of exclusivity, the Florida Supreme Court has recognized that intentional torts may fall outside the purview of the Act. *See Fisher,* 498 So.2d at 883. In particular, an employer's actions amount to an intentional tort where the employer either "exhibit[s] a deliberate intent to injure or engage[s] in conduct which is substantially certain to result in injury or death." *Id.* In *Fisher,* the Supreme Court of Florida did not address the ultimate issue of whether such intentional torts were beyond the purview of the Act because the plaintiff's allegations failed to allege facts which would amount to an intentional tort. *Id.* at 884. However, in subsequent cases Florida courts have held that employees satisfying the *Fisher* test did state a claim for an intentional tort which was not barred by the Act. *See, e.g., Cunningham v. Anchor Hocking Corp.,* 558 So.2d 93 (Fla.Dist.Ct. App.1990) (finding that employees did state a claim under *Fisher* for an intentional tort outside the scope of the Act).

Two decisions from the Supreme Court of Florida involve allegations closely analogous to those supporting Plaintiffs' fraudulent concealment claim in this case. In *Fisher*, the personal representative of an employee's estate brought a wrongful death action against a construction company for which the employee worked. The employee, acting on his employer's orders, was cleaning the inside of an underground pipe when he succumbed to noxious methane gas fumes. *Fisher*, 498 So.2d at 883. This exposure ultimately led to the employee's death, leading to the lawsuit by his estate against the employer.

The trial court dismissed the complaint based on the exclusivity provisions of the Act. On appeal to the state district court, the trial court's decision was affirmed on the grounds that intentional torts fell within the purview of the Act. The case was then certified to the Supreme Court of Florida which held that the district court should not have addressed the relationship between intentional torts and the Act without first determining whether the plaintiff had stated a claim for an intentional tort. *Fisher*, 498 So.2d at 883. The plaintiff's complaint alleged that the employer required the employee to enter pipes which it knew contained noxious fumes and which would "in all probability" cause injury or death. *Id.* The complaint also alleged the employer failed to provide employees with oxygen masks, gas detection equipment, and other safety equipment, and that the employer otherwise failed to comply with OSHA regulations. *Id.* The Supreme Court of Florida concluded that even these severe allegations did not rise to the level of an intentional tort because they did not indicate either a "deliberate intent to injure or . . . conduct which is substantially certain to result in injury or death." *Id.* The Supreme Court of Florida explained that the strict interpretation was necessary "because nearly every accident, injury, and sickness occurring at the workplace results from someone intentionally engaging in some triggering action." *Id.*

Even more instructive is a decision handed down by the Supreme Court of Florida on the same day as it decided *Fisher*. In *Lawton*, a worker (Lawton), whose hand was injured in a punch-press accident, brought a tort action against the employer alleging an intentional tort. *Lawton*, 498 So.2d at 880. Lawton was a punch-press operator who caught his hand in the press when a co-worker accidentally put the press into operation as Lawton attempted to adjust the press. *Id.* The accident crushed Lawton's hand and resulted in the loss of all his fingers on that hand. Lawton applied for and received workers compensation benefits from his employer's insurance carrier and filed suit against the press manufacturer. During discovery in the lawsuit against the press manufacturer, Lawton learned that the press manufacturer had delivered numerous communications to the employer informing it that, for safety reasons, guards should be provided on the press and that operators should be instructed on the dangers involved in operating the press. Thereafter, Lawton amended his complaint to add his employer as a defendant. Lawton then amended his complaint another time to add a fraud claim against the employer. *Id.*

In relying on the standard set forth in *Fisher*, the Supreme Court of Florida held that Lawton's allegations, including his fraud claim, did not rise to the level of intentional tort. The court emphasized that the factual allegations must indicate more than a "strong probability" of injury. *Id.* Instead, the intentional tort exception requires "virtual certainty." *Id.* The Supreme Court of Florida concluded that, "[a]lthough the complaint may indeed allege a *prima facie* case of gross negligence, the Act makes no distinction among degrees of negligence." *Id.* at 881. Thus, the Supreme Court of Florida concluded that the Act was Lawton's only available remedy.

■ The Supreme Court of Florida's rulings in *Fisher* and *Lawton* demonstrate

that the factual allegations in this case do not rise to the level of an intentional tort under Florida law. Here, when viewed in the light most favorable to the Plaintiffs, the amended complaint fails to allege facts which indicate that Defendant acted with a deliberate intent to injure or engaged in conduct which was substantially certain to result in injury or death. At most, Plaintiffs' allegations support a finding that Defendant allowed its employees to be exposed to unidentified contaminants believed to be responsible for the sick building symptoms experienced by *some* of its employees. Such allegations fall well short of indicating that Defendant engaged in conduct substantially certain to injure all or nearly all of its employees. To satisfy the high standard set forth under *Fisher* Plaintiffs must allege facts establishing that injury to Plaintiffs was a "virtual certainty." *Lawton*, 498 S.2d at 881–82. Plaintiffs have failed to do so. Accordingly, Plaintiffs have failed to allege an intentional tort which would entitle them to avoid the exclusivity provision of the Act.[3]

## CONCLUSION

For the foregoing reasons, the court will grant U.S. Airways, Inc.'s motion to dismiss.

An order in accordance with this memorandum opinion shall be entered contemporaneously herewith.

3. Plaintiffs also seek to avoid the exclusivity provision by invoking the dual capacity and dual persona doctrines. Plaintiffs contend that these doctrines prevent an employer from relying upon the exclusivity bar to a civil action when the employee's injury arises from the employer's breach of a legal duty owed independently of the employment relationship. In particular, Plaintiffs assert that Defendant U.S. Airways is the employer and Defendant Piedmont is the owner landlord of the building. Even though it is undisputed that Piedmont Aviation, Inc., was merged into U.S. Airways in 1989, Plaintiffs contend that U.S. Airways now stands in two distinct relationships: employer and through Piedmont as quasi-landlord. The court is skeptical that

*ORDER*

For the reasons set forth in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED that Defendant's motion to dismiss [Doc. # 8] is **GRANTED** and this action be, and the same hereby is, **DISMISSED.**

these doctrines are applicable under the facts of this case as it is clear upon the merger of Piedmont into U.S. Airways Piedmont ceased to exist and there was never a time where Piedmont acted as landlord and U.S. Airways acted as employer. In any event, the court does not need to reach this issue as Plaintiffs concede that these doctrines have never been recognized by Florida or North Carolina. Sitting in diversity this court is bound to apply the applicable state law as it exists and cannot create or expand the common law. *See Burris Chem. Inc. v. USX Corp.*, 10 F.3d 243, 247 (4th Cir.1993) (refusing to apply a discovery rule to a Florida contractual notice provision where no Florida case had done so).